UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
JOANNA GONZALEZ,

                  Plaintiff,

      -against-

NEBRASKALAND, INC., DANIEL ROMANOFF,
individually, and MAURICIO INGRAO, individually,

                  Defendants.
------------------------------------------------------------------X

Case No. 1:22-cv-10413

**COMPLAINT**

Plaintiff Demands
A Trial By Jury

Plaintiff, Joanna Gonzalez, by and through her attorneys, Phillips & Associates, PLLC, upon information and belief, complains of Defendants as follows:

**INTRODUCTION**

1. Plaintiff complains pursuant to Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §2000e et seq. ("Title VII") and the Family Medical Leave Act ("FMLA"); and to remedy violations of the New York State Human Rights Law, New York State Executive Law, §§ 296 et seq. ("NYSHRL"), and the New York City Human Rights Law, New York City Administrative Code §§ 8-107 *et. seq.* ("NYCHRL"), based upon the supplemental jurisdiction of this Court pursuant to *Gibbs*, 383 U.S. 715 (1966) and 28 U.S.C. §1367, seeking damages to redress the injuries Plaintiff has suffered as a result of being discriminated against on the basis of her sex/gender, pregnancy, and actual and/or perceived disability, together with creating a hostile work environment, failure to provide a reasonable accommodation, failure to engage in the interactive process and/or cooperative dialogue, retaliation, and constructive discharge.

## JURISDICTION AND VENUE

2.   The Court has jurisdiction pursuant to 29 U.S.C. §2617; 28 U.S.C. §1331, §1343, and supplemental jurisdiction thereto.

3.   This action involves a Question of Federal Law.

4.   The Court also has jurisdiction pursuant to 28 U.S.C. §1332 in that there is complete diversity of citizenship and the matter in controversy exceeds, exclusive of interest and costs, the sum of $75,000.

5.   Venue is proper in this district based upon the fact that a substantial part of the events and omissions giving rise to the claim occurred within the Southern District of the State of New York.  28 U.S.C. §1391(b).

6.   On or about June 23, 2021, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").

7.   On or about October 20, 2022, Plaintiff received a Notice of Right to Sue Letter from the EEOC.

8.   This action is brought within ninety (90) days of said Notice of Right to Sue Letter.

## PARTIES

9.   Plaintiff is a female resident of the State of Florida, County of Osceola.

10.   At all times material, Defendant NEBRASKALAND, INC. (hereinafter also referred to as "NEBRASKALAND") was and is a domestic corporation duly existing under the laws of the State of New York.

11.   At all times material, Defendant NEBRASKALAND was and is a meat distribution company located at Hunts Point Cooperative Market, Building G, Bronx, New York 10474.

2

12.    At all times material, Defendant DANIEL ROMANOFF (hereinafter also referred to as "ROMANOFF") was and is a resident of the State of New York.

13.    At all times material, Defendant ROMANOFF was and is the President and Owner of Defendant NEBRASKLAND.

14.    At all times material, Defendant ROMANOFF was and is Plaintiff's supervisor, and/or had supervisory authority over Plaintiff.

15.    At all times material, Defendant MAURIZIO INGRAO (hereinafter also referred to as "INGRAO") was and is a resident of the State of New York.

16.    At all times material, Defendant INGRAO was and is working for Defendant NEBRASKALAND as a Sales Manager.

17.    At all times material, Defendant INGRAO was Plaintiff's supervisor and/or had supervisory authority over Plaintiff.

18.    At all times material, Defendant NEBRASKALAND was and is a qualified employer under the FMLA.

19.    At all times material, Defendant NEBRASKALAND engaged in an industry affecting commerce.

20.    At all times material, Defendant NEBRASKALAND employed at least 50 or more employees within a 75-mile radius of Plaintiff's location for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year.

21.    At all times material, Plaintiff was and is a qualified employee under the FMLA.  Plaintiff worked for Defendant NEBRASKALAND for at least 12 months and for at least 1,250 hours during those 12 months.

22.    Defendant NEBRASKALAND, Defendant ROMANOFF and Defendant INGRAO are hereinafter collectively referred to as "Defendants."

3

23.   At all times material, Plaintiff was and is an employee of Defendants.

## MATERIAL FACTS

24.   On or about January 2, 2019, Plaintiff began working for Defendants as a Sales and Marketing Representative. Although she had a desk in Defendants' office, which was located above the warehouse, Plaintiff's duties primarily included driving to Defendant NEBRASKALAND's clients and assisting them with "Handshake," an application that facilitates customer orders from Defendant NEBRASKALAND's warehouse.   Plaintiff was a full-time employee, working from 9:00 a.m. to 5:00 p.m., and earned a salary of approximately $69,600 per year.

25.   Throughout her employment, Plaintiff was a dedicated and reliable employee who completed her assignments without issue, and Defendants praised Plaintiff's work both verbally and in emails.

26.   On or about May 23, 2020, while she was out of the office, Plaintiff was involved in a severe car accident and dislocated her left hip.

27.   That same day, Plaintiff notified her supervisor, Defendant INGRAO, about her injuries and anticipated hip surgery.  This put Defendants on notice of Plaintiff's need for a reasonable accommodation.  Plaintiff also contacted Human Resources (HR) Representative, Vanessa Edmead, and completed FMLA documentation in support of her required leave, with an anticipated return date of July 6, 2020.

28.   In or around the beginning of July 2020, during a doctor's appointment, Plaintiff learned that she was pregnant.  As a result, Plaintiff's hip surgery was postponed indefinitely.

29.   On or about July 6, 2020, on her first day back at work, Plaintiff told Defendant INGRAO that she was approximately two months pregnant.

30. In or around August 2020, in Plaintiff's presence, Defendant INGRAO disclosed Plaintiff's pregnancy to another employee, Maryelis (last name currently unknown) by asking, "**Did *you* know that [Plaintiff] is pregnant**?"  Maryelis was visibly surprised and uncomfortable with Defendant INGRAM's question, and asked, "**Why would you tell me [Plaintiff's] business**? My god."

31. In or around the beginning of October 2020, Defendant INGRAO telephoned Plaintiff and asked her when her baby was due, and whether she intended to take any maternity leave. Plaintiff told Defendant INGRAO that she expected to deliver her baby at the end of February 2021.  Plaintiff also stated that she intended to take twelve (12) weeks of maternity leave. Defendant INGRAO groaned, clearly inconvenienced by Plaintiff's anticipated maternity leave, and replied, "**Damn… I will need to hire someone else because I will not be able to cover you for all that time**."

32. Defendant INGRAO also informed Defendant ROMANOFF about Plaintiff's pregnancy and anticipated need for leave.

33. Once Plaintiff's pregnancy became more visible, Defendant INGRAO and Defendant ROMANOFF began to harass and retaliate against Plaintiff for her pregnancy and/or her future need for protected leave by overly scrutinizing her performance.  Their actions were intended to create a paper trail of pretextual performance issues in order to justify terminating her employment and/or constructively discharging her.

34. For example, beginning in or around October 2020, Defendant ROMANOFF began sending Plaintiff a string of emails blaming her for the "Handshake" application's technical malfunctions, which were out of Plaintiff control and the responsibility of the application's technological support representatives, of which both Defendant ROMANOFF and Defendant

INGRAO were fully aware.  In fact, both were copied on all correspondence between Plaintiff and the application's tech support representatives.

35.   Regardless, on or about October 26, 2020, Defendant ROMANOFF gave Plaintiff a "Final" write-up due to purported errors concerning the "Handshake" application.     Plaintiff had not received any other verbal or written disciplinary write-ups or coaching prior to disclosing her pregnancy and/or need for future protected leave.

36.   On or about December 2, 2020, in further retaliation, and based on the pretextual write-up, Defendants demoted Plaintiff to a drastically different job title and responsibilities. Specifically, HR Representative, Ms. Edmead, called Plaintiff into a meeting with Defendant INGRAO and Chief Financial Officer, Steven Raptis, and informed Plaintiff that her title would change from a Sales and Marketing Representative to a "Receiving Clerk," effective the very next day.[1] When Plaintiff asked about the reason for the abrupt change, Ms. Edmead simply stated, "The 'Handshake' project isn't going in the direction it was supposed to go."

37.   As a Receiving Clerk, Plaintiff no longer held a supervisory or managerial position, and she was required to work in the warehouse, reviewing shipments and accepting deliveries of frozen product shipments.

38.   Plaintiff's work hours also changed from her "regular business hours" of 9 a.m. to 5 p.m. to **5:00 a.m. to 1 p.m.**

39.   Plaintiff was the only female employee out of nearly 20 employees who worked in the warehouse.

---

[1] In fact, the next morning, Plaintiff arrived at work early to retrieve her belongings from her desk and realized that Defendants had already revoked her key access into the office.

40.   Additionally, Plaintiff, who was approximately seven (7) months pregnant, was now forced to work in a hazardous work environment that was unsuitable for a pregnant individual.

41.   For example, the temperature in the warehouse was generally between 24-30 degrees Fahrenheit during the winter months.  As a result, Plaintiff was now forced to wear a thick jacket, gloves, and a hat to keep from freezing at her desk.

42.   Additionally, Plaintiff needed to familiarize herself with warehouse safety measures in order to protect herself from any potential injuries that could be caused by the forklift drivers who transported shipments in and out of the warehouse.

43.   Finally, when she arrived for her first shift, Plaintiff's new supervisor, Receiving Manager Steven Rodriguez, told her, "You're gonna have to use the bathroom in the main office because the bathroom down here is dirty and nasty."  As a result, and while heavily pregnant, Plaintiff was forced to repeatedly walk upstairs to use the bathroom in the main office because the warehouse bathroom was not clean.

44.   Defendants demoted Plaintiff to a less desirable position in order to force her to resign or be constructively discharged.

45.   Defendants' discriminatory and retaliatory actions toward Plaintiff were so blatant and punitive that multiple employees who worked in the upstairs office approached Plaintiff and acknowledged Defendants' unlawful actions.

46.   For example, on or about December 3, 2020, Salesperson, Elsis Rodrigues, approached Plaintiff when she exited the bathroom and stated, "The warehouse is not a place for a pregnant woman.  **[Defendant ROMANOFF] is only doing this to you because you're pregnant**."

47.   That same day, another office employee, Sales and Marketing Representative, Josephina Genao, told Plaintiff, "**[Defendant ROMANOFF] doesn't like it when women get pregnant**."

7

48.   Additionally, another female coworker who works in the upstairs office told Plaintiff, "I wanted to be a manager in the warehouse but **[Defendant ROMANOFF] always said he doesn't want women working downstairs**."

49.   Additionally, one of the warehouse employees (name currently unknown) approached Plaintiff and stated, "**Upstairs is like 'upper class' and down here is like 'lower class.'  A pregnant woman should not be working here**."

50.   After speaking with her coworkers, Plaintiff returned downstairs to her desk in the warehouse and began to cry.  Mr. Rodriguez saw Plaintiff crying and asked her whether she was okay. Plaintiff responded that she believed that she was being discriminated against because she was pregnant and approaching her maternity leave.  Plaintiff also complained that she believed she was moved to the warehouse so she would quit the company on her own.

51.   Mr. Rodriguez offered to escort Plaintiff back to the upstairs bathroom to compose herself.  As she walked to the bathroom, Plaintiff saw that Defendants had already replaced her with another (non-pregnant) female employee, who was seated at her former desk.

52.   In fact, that same week, in order to further harass and embarrass Plaintiff, Defendants sent out a company email to the upstairs office staff informing them that Plaintiff was replaced with another employee and relocated to the warehouse.

53.   On or about December 7, 2020, in retaliation for Plaintiff's complaint to Mr. Rodriguez, Ms. Edmead called Plaintiff into her office and gave her a write-up which stated,

> **"[Plaintiff] stated to [Mr. Rodriguez] Receiving Mgr that she was de[m]oted and [Defendant NEBRASKALAND] demoted her due to her pregnancy.  This is a false claim.  [Plaintiff] cannot misrepresent the company and if she has any concerns she can speak to Human Resources.  Any further actions can lead to further disciplinary action including termination."**

54.   In response to the write-up, Plaintiff reiterated her complaint that she believed she was demoted due to her pregnancy.   Plaintiff also complained that she had previously received emails commending her on her performance, and Defendant INGRAO only began to reprimand her once she informed him about her intent to take protected (maternity) leave.   In response, Ms. Edmead coldly stated, "**No one is discriminating against you, and I am not aware of any emails about your good performance**."

55.   During the meeting, Plaintiff also complained about the low temperature in the warehouse, stating stated that it was affecting her health and the health of her unborn child.   Ms. Edmead dismissed Plaintiff's concerns and replied, "It's not cold down there."   Plaintiff continued, "All the warehouse employees are required to wear heavy jackets to be down there."   Ms. Edmead retorted, "Maybe *I* haven't noticed because I'm never in the warehouse for very long."   Based on Edmead's dismissive response, Plaintiff realized that Defendants did not intend to address any of her complaints of discrimination or retaliation, or discuss a possible reasonable accommodation, so Plaintiff returned to her desk in the warehouse.

56.   In further retaliation, Defendants also began to harass and scrutinize Plaintiff's performance in the warehouse.

57.   For example, on or about December 30, 2020, "Operations/Finance Controller," Sasson Ovadia, gave Plaintiff a pretextual write-up for an alleged incident involving Defendant ROMANOFF the previous day.   Mr. Ovadia falsely accused Plaintiff of failing to inform him that she had placed Defendant ROMANOFF "on hold" for ten minutes.   However, this was clearly pretextual, since Plaintiff informed Mr. Ovadia about the call immediately after placing it on hold, and then followed up with him again a minute later.

58.   Shortly after, Mr. Ovadia loudly told the warehouse employees that no one was allowed to leave before 3:00 p.m.   However, since Plaintiff **was the only warehouse employee who was**

**required to arrive to work by 5:00 a.m.**, she prepared to leave at 1:00 p.m. and informed Mr.
Rodriguez, who replied, "**[Mr. Ovadia] doesn't want anyone to leave before 4:00 p.m. but
he's really talking about you, because everyone else works 7:00 or 8:00 to 4:00 p.m.  I
really don't know why [Mr. Ovadia] wants you to stay when you're not needed.**" Plaintiff
explained that she was feeling severe back pain relating to her pregnancy and could not work
an additional two hours.  Mr. Rodriguez allowed Plaintiff to leave at her scheduled departure
time.

59.   Later that same day, Plaintiff went to see her doctor, Ecaterina M. Moisa-Babii, M.D., who
      diagnosed her with sciatica, a medical condition that is common in late pregnancy and is
      characterized by severe back pain.  As a result, Plaintiff was also diagnosed with a high-risk
      pregnancy.   Dr. Moisa-Babii also completed FMLA documentation in connection with
      Plaintiff's sciatica diagnosis, and gave Plaintiff a doctor's note requesting an accommodation
      in the form of working "no more than eight (8) hours per workday for the remainder of her
      pregnancy."   Plaintiff submitted the documents to Ms. Edmeed that same day.

60.   On or about December 31, 2020, the next day, Mr. Ovadia asked Plaintiff why she left work
      at 1:00 p.m. the previous shift.  Plaintiff explained that she was in pain and that she submitted
      FMLA documentation and a doctor's note to Ms. Edmeed.  Mr. Ovadia became visibly angry
      and walked upstairs to speak to Ms. Edmeed.

61.   That same day, in further retaliation, Ms. Edmeed called Plaintiff into her office and informed
      her that she would be demoted from a salaried employee to an hourly employee.  Defendants
      cut Plaintiff's pay from a salary of approximately $1,339.18/week to an hourly wage of
      $26.78/hour.  As a result, Plaintiff now earned approximately $300 less per week.

62.   When Plaintiff inquired about the reason for the pay cut, Ms. Edmead specifically stated,
      "**Salaried people work overtime.  Since your doctor says that you can't work more than**

**8 hours a day, you can no longer be salary.  You're going to be hourly**."  However, this was false, because Plaintiff regularly worked a forty-hour schedule as a salaried employee prior to her pregnancy and request for a reasonable accommodation.

63.     During the meeting, Plaintiff complained, "**The hourly rate is less than my salary, it's not equivalent to my pay.  I have always worked 40 hours, no more than that.  I believe you're only doing this because of my pregnancy**."  Ms. Edmead replied, "I need to accommodate what the doctor said, and that means changing your pay."  Plaintiff then asked, "Will I go back to my salary after I return from maternity leave?"  Ms. Edmead replied, "**I can't guarantee that**."

64.     On or about January 5, 2021, Mr. Rodriguez approached Plaintiff and asked her, "Why are you being treated this way here?"  Plaintiff said, "It's because I'm pregnant and going on maternity leave soon."  Mr. Rodriguez again acknowledged Defendants' discriminatory animus, stating, "**Upstairs [Defendants] definitely got it out for you**."

65.     On or about January 13, 2021, in further retaliation, Mr. Ovadia gave Plaintiff a write-up and suspended her for one day for allegedly processing three delivery invoices incorrectly. However, Plaintiff followed Mr. Rodriguez' instructions regarding the invoices.

66.     On or about January 18, 2021, Plaintiff walked past Mr. Ovadia's desk and noticed that he left his computer open to an email he had received from Defendant ROMANOFF.  In the email, Defendant ROMANOFF instructed Mr. Ovadia to check the cameras and give Plaintiff a write-up and/or suspend Plaintiff for allegedly asking Mr. Rodriguez to make copies for her.  At this point, Plaintiff was **eight months pregnant and suffering from sciatica**.

67.     That same day, after the end of her shift, Plaintiff learned that her sister tested positive for Coronavirus, and she went to take a test herself.  Although she tested negative, Plaintiff received a call from New York State Department of Health instructing her to quarantine at

home and get tested again three days later.  Plaintiff complied and tested negative again on January 21, 2021, but she continued to quarantine per the State's guidance.  Plaintiff also submitted a note to Ms. Edmeed in support of her leave.

68.    From February 1, 2021 to February 13, 2021, due to Defendants' ongoing harassment and retaliation, and for her own mental health and well-being, Plaintiff took the remainder of her vacation days and remained at home.

69.    Beginning on February 15, 2021, Plaintiff started her maternity leave, and delivered her baby on February 27, 2021.

70.    On or about April 9, 2021, while she was still out on leave, Plaintiff, through her counsel, sent Defendant NEBRASKALAND a "claim letter" and "draft complaint" which were for "settlement purposes only". The draft complaint laid out Plaintiff's allegations of discrimination, harassment, and retaliation.

71.    On or about April 13, 2021, Defendant NEBRASKALAND's counsel notified Plaintiff's counsel that she was representing Defendant NEBRASKALAND and was "in receipt of [the] demand letter."

72.    On or about April 16, 2021, counsel for both parties discussed Plaintiff's claims.

73.    Three (3) weeks later, on or about May 5, 2021, Defendant, through its counsel, notified Plaintiff's counsel that "[Defendant] Nebraskaland expected, and continues to expect that [Plaintiff] will return from her leave of absence in late May, as scheduled." Plaintiff's return to work date was May 25, 2021. Plaintiff was also told that she could resign.

74.    Defendant NEBRASKALAND's response did not mention any negotiations or offers of compromise. It did not address the allegations in the complaint. It simply informed Plaintiff that Defendant expected her to return to work, or that she could resign.

75. Nevertheless, on or about May 14, 2021, counsel for the parties had a discussion where an initial demand to resolve the matter was given by Plaintiff's counsel. This was the first and only time any meaningful discussion regarding possible settlement or resolution occurred between the parties.

76. Knowing Plaintiff's return date was ten (10) days away, Defendant NEBRASKALAND purposefully delayed any response to Plaintiff's initial demand, and delayed discussing any negotiations, because it knew that, doing so, would dissuade Plaintiff from returning to work because it had purposefully failed to offer her any protection from retaliation and/or protection from continued harassment and discrimination. Defendant NEBRASKALAND never offered or mentioned any remedial measures with respect to the alleged harassment and discrimination. Therefore, Plaintiff reasonably believed that returning to work after her leave would subject her to further harassment, discrimination, and retaliation.

77. None of Defendant NEBRASKALAND's responses with or through counsel discussed, or mentioned any negotiations, furnishings, promises, or offers of compromise.

78. Defendant NEBRASKALAND did not engage in good faith negotiations, or any negotiations for that matter.

79. Defendant NEBRASKALAND purposefully did not engage in negotiations and/or purposefully delayed responding to Plaintiff, specifically to constructively discharge Plaintiff.

80. Defendant NEBRASKALAND's actions/inactions demonstrated its *modus operandi* to give Plaintiff no choice but to be constructively terminated.

81. Plaintiff reasonably believed that she would have to return to the same intolerable working conditions, and retaliatory actions, that were taken against her prior to her maternity leave.

82. On or about May 24, 2021, Defendant NEBRASKALAND did constructively terminate Plaintiff.

83. Defendant NEBRASKALAND's actions/inactions demonstrated its animus towards Plaintiff because of her complaints of discrimination, harassment, and retaliation.

84. Defendant NEBRASKALAND's actions/inactions after receiving the claim letter were further retaliation against Plaintiff for exercising her protected rights to seek legal counsel and for engaging an attorney.

85. Defendant NEBRASKALAND's actions/inactions after receiving the claim letter demonstrate bad faith.

86. Defendant NEBRASKALAND's actions/inactions after receiving the claim letter created a new, independent, cause of action for retaliation which is unrelated to the other underlying claims that were the basis of any discussions.

87. Defendant NEBRASKALAND's actions/inactions after receiving the claim letter created a new, independent, cause of action for constructive discharge which is unrelated to the other underlying claims which were the basis of any discussions.

88. As a result of Defendants' actions/inactions, Plaintiff felt, and continues to feel, extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

89. As a result of Defendants' actions, Plaintiff felt, and continues to feel, extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

90. As a result of the Defendants' discriminatory and intolerable treatment of Plaintiff, she suffered severe emotional distress and physical ailments.

91. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of a salary, bonuses, benefits and other compensation which such employment entails, and Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

92.    As a result of the above, Plaintiff has been damaged in an amount which exceeds the jurisdictional limits of all lower courts.

93.    As Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands Punitive Damages.

**AS A FIRST CAUSE OF ACTION**
**UNDER TITLE VII**
**DISCRIMINATION**
**(Against the Corporate Defendant only)**

94.    Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

95.    This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq., as amended, for relief based upon Defendant NEBRASKALAND's unlawful employment practices.   Plaintiff complains of Defendant NEBRASKALAND's violation of Title VII's prohibition against discrimination in employment based, in whole or in part, upon an employee's sex and pregnancy.

96.    Defendant NEBRASKALAND engaged in unlawful employment practices prohibited by Title VII by discriminating against Plaintiff on the basis of her sex, pregnancy, and actual and/or perceived (temporary) disability, together with creating a hostile work environment, and constructive discharge.

**AS A SECOND CAUSE OF ACTION**
**UNDER TITLE VII**
**RETALIATION**
**(Against the Corporate Defendant only)**

97.    Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

98.    Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-3(a) provides that it

shall be an unlawful employment practice for an employer:

> "(1) to…discriminate against any of his employees…because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

99.   Defendant NEBRASKALAND engaged in an unlawful employment practice prohibited by 42 U.S.C. §2000e *et seq.* by discriminating against Plaintiff with respect to the terms, conditions or privileges of employment, because of her opposition to its unlawful employment practices.

## AS A THIRD CAUSE OF ACTION
## UNDER THE FAMILY AND MEDICAL LEAVE ACT
## RETALIATION & INTERFERENCE

100.   Plaintiff repeats, reiterates and re-alleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

101.   §2614 of the Act states as follows:

> "(a) Restoration to position (1) In general. Except as provided in subsection (b), any eligible employee who takes leave under section [§2612] for the intended purpose of the leave shall be entitled, on return from such leave — (A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or (B) to be restored to an equivalent position."

102.   §2615 of the Act states as follows:

> (a) Interference with rights
> (1) Exercise of rights.  It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.
> (2) Discrimination.  It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

103.   Defendant NEBRASKALAND interfered with Plaintiff's rights under the above sections, discriminated against Plaintiff, and constructively discharged Plaintiff from her employment because she requested and/or took FMLA-protected leave.

16

## AS A FOURTH CAUSE OF ACTION
## UNDER THE NEW YORK STATE HUMAN RIGHTS LAW
## <u>DISCRIMINATION</u>

104.  Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

105.  Executive Law § 296 provides that "1. It shall be an unlawful discriminatory practice: "(a) For an employer or licensing agency, because of an individual's … sex, pregnancy, disability … to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

106.  Defendants engaged in an unlawful discriminatory practice by discriminating against Plaintiff on the basis of her sex, pregnancy, and actual and/or perceived disability, together with creating a hostile work environment, failure to engage in the interactive process and/ or cooperative dialogue and constructive discharge.

107.  Plaintiff hereby makes a claim against Defendants under all applicable paragraphs of Executive Law Section 296.

## AS A FIFTH CAUSE OF ACTION
## UNDER THE NEW YORK STATE HUMAN RIGHTS LAW
## <u>RETALIATION</u>

108.  Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

109.  New York State Executive Law §296(7) provides that it shall be an unlawful discriminatory practice "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person before he has opposed any practices forbidden under this article."

110.    Defendants engaged in an unlawful and retaliatory discriminatory practice by retaliating, and otherwise discriminating against Plaintiff because of her opposition to Defendants' unlawful actions.

## AS A SIXTH CAUSE OF ACTION
## UNDER THE NEW YORK STATE HUMAN RIGHTS LAW
## FAILURE TO PROVIDE A REASONABLE ACCOMMODATION

111.    Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

112.    New York State Executive Law §296(3)(a) provides:

> "It shall be an unlawful discriminatory practice for an employer, licensing agency, employment agency or labor organization to refuse to provide reasonable accommodations to the known disabilities of an employee, prospective employee or member in connection with a job or occupation sought or held or participation in a training program."

113.    Defendants engaged in an unlawful discriminatory practice by discriminating against the Plaintiff for her actual and/or perceived disability (high-risk pregnancy), together with creating a hostile work environment, retaliation, failure to provide a reasonable accommodation, failure to engage in the interactive process and constructive discharge.

## AS A SEVENTH CAUSE OF ACTION
## UNDER NEW YORK STATE HUMAN RIGHTS LAW
## AIDING AND ABETTING

114.    Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

115.    New York State Executive Law §296(6) provides that it shall be an unlawful discriminatory practice:

> "For any person to aid, abet, incite, compel or coerce the doing of any acts forbidden under this article, or attempt to do so."

116.   Defendants engaged in an unlawful discriminatory practice in violation of New York State Executive Law §296(6) by aiding, abetting, inciting, compelling and coercing the discriminatory conduct.

## AS AN EIGHTH CAUSE OF ACTION
## UNDER THE NEW YORK CITY HUMAN RIGHTS LAW
## DISCRIMINATION

117.   Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

118.   The Administrative Code of City of New York, Title 8, §8-107 [1] provides that "It shall be an unlawful discriminatory practice: (a) For an employer or an employee of agent thereof, because of the actual or perceived … gender … pregnancy… disability… of any person; […] (2), to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

119.   Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, §8-107(1)(a) by creating and maintaining discriminatory working conditions, and otherwise discriminating against Plaintiff on the basis of gender, pregnancy, actual and/or perceived disability, together with creating a hostile work environment, failure to engage in the interactive process and/ or cooperative dialogue, and unlawful termination.

## AS A NINTH CAUSE OF ACTION
## UNDER THE NEW YORK CITY HUMAN RIGHTS LAW
## RETALIATION

120.   Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

121.   The New York City Administrative Code Title 8-107(7) provides that:

> "It shall be unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter, (ii) filed a complaint, testified or assisted in any proceeding under this chapter, (iii) commenced a civil action alleging the commission of an act which would be an unlawful discriminatory practice under this chapter…"

122.   Defendants engaged in an unlawful and retaliatory discriminatory practice by retaliating, and otherwise discriminating against Plaintiff, including, but not limited to terminating Plaintiff.

## AS A NINTH CAUSE OF ACTION
## UNDER THE NEW YORK CITY HUMAN RIGHTS LAW
## FAILURE TO PROVIDE A REASONABLE ACCOMMODATION

123.   Plaintiff repeats, reiterates and re-alleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

124.   The Administrative Code of the City of New York §8-107(15)(a) provides:

> "[A]ny person prohibited by the provisions of this section from discriminating on the basis of disability shall make reasonable accommodation to enable a person with a disability to satisfy the essential requisites of a job or enjoy the right or rights in question provided that the disability is known or should have been known by the covered entity."

125.   Defendants engaged in an unlawful discriminatory practice in violation of the New York City Administrative Code §8-107(15)(a) by failing to provide a reasonable accommodation, and by failing to engage in the cooperative dialogue.

## AS A TENTH CAUSE OF ACTION
## UNDER THE NEW YORK CITY ADMINISTRATIVE CODE
## AIDING & ABETTING

126.   Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

127.   The New York City Administrative Code Title 8-107(6) provides that it shall be an unlawful

discriminatory practice, "For any person to aid, abet, incite, compel or coerce the doing of any acts forbidden under this chapter, or attempt to do so."

128.   Defendants engaged in an unlawful discriminatory practice by aiding, abetting, inciting, compelling, and coercing the discriminatory conduct.

**WHEREFORE,** Plaintiff respectfully requests a judgment against the Defendants:

A.   Declaring that the Defendants engaged in unlawful employment practices prohibited by Title VII, the Family and Medical Leave Act, the New York State Human Rights Law and the New York City Human Rights Law on the basis of Plaintiff's sex/gender, pregnancy, actual and/or perceived disability, and creating a hostile work environment, together with failure to engage in the interactive process and/ or cooperative dialogue, retaliation, aiding and abetting, and constructive discharge;

B.   Awarding damages to the Plaintiff for any lost wages and benefits, past and future, back pay and front pay, resulting from Defendants' unlawful employment practices;

C.   Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to reputation in an amount in excess of the jurisdiction of all lower courts;

D.   Awarding Plaintiff liquidated damages under the FMLA;

E.   Awarding Plaintiff Punitive Damages;

F.   Awarding Plaintiff attorney's fees, costs, and expenses incurred in the prosecution of the action;

G.   Awarding Plaintiff such other and further relief as the Court may deem equitable, just, and proper to remedy the Defendants' unlawful employment practices.

## JURY DEMAND

Plaintiff requests a jury trial on all issues to be tried.

**WHEREFORE,** Plaintiff demands judgment against Defendants in an amount to be determined at the time of trial plus interest, punitive damages, attorneys' fees, costs, and disbursements of action; and for such other relief as the Court deems just and proper.

Dated:     December 9, 2022
           New York, NY


                              **PHILLIPS & ASSOCIATES, PLLC**
                              *Attorneys for Plaintiff*


                   By:     */s/Silvia C. Stanciu, Esq.*
                           Silvia C. Stanciu, Esq.
                           45 Broadway, Suite 430
                           New York, NY 10006
                           212-248-7431

22